STATE OF NORTH CAROLINA    IN THE GENERAL COURT OF JUSTICE
COUNTY OF WAKE    SUPERIOR DIVISION
FILE NO. 22 CVS 15172

FILED
2022 DEC 13 P 12: 15
WAKE CO. C.S.C.
BY_____

DELBERT QUILLEN WARD,

    Plaintiff,

    v.        **COMPLAINT**

THE CITY OF RALEIGH,

    Defendant.

## I. INTRODUCTION

NOW COMES the Plaintiff Delbert Quillen Ward (referred herein as the "Plaintiff"), by and through undersigned counsel, for its Complaint against Defendant the City of Raleigh, (referred herein as the "Defendant"), alleging and complaining of the following:

## II. NATURE OF THIS ACTION

1. This is an action in equity for excessive force used by an officer effectuating an arrest.

2. This action is brought pursuant to, *inter alia*, 42 U.S.C. 1983, for violation of Plaintiff's right against unreasonable searches and seizures stemming from the Fourth Amendment to the United States Constitution.

## III. PARTIES

1. Plaintiff is an individual citizen of and residing in Orange County, North Carolina.

2. Defendant is the City of Raleigh and can be served with the process by mailing a copy of the summons and complaint addressed to the mayor, city manager, or clerk.

City's Ex. 2

1

Case 5:23-cv-00559-BO-RJ Document 1-3 Filed 10/09/23 Page 1 of 13
Electronically Filed Date: 8/28/2023 4:45 PM Wake County Clerk of Superior Court

## IV. JURISDICTION AND VENUE

3.    This Court has subject-matter jurisdiction over the action pursuant to, *inter alia*, N.C. Gen. Stat. § 7A-243, because the amount in controversy is over the sum of $25,000.00.

4.    This Court has personal jurisdiction over Defendant pursuant to N.C. Gen. Stat. § 1-75.4(3), because Plaintiff was injured by acts committed by Defendant within this State.

5.    Venue is proper in the Court pursuant to N.C. Gen. Stat. § 1-77(2) because Defendant is a public officer, and the cause of action along with the acts and omissions giving rise to the cause of action occurred in Wake County.

## V. FACTUAL ALLEGATIONS

6.    On August 28, 2020, Plaintiff attended a protest march for racial justice in downtown Raleigh.

7.    Plaintiff arrived at the protest at approximately 10:00 PM.

8.    Defendant had imposed an 11:00 PM emergency curfew for the city.

9.    During the protest, Plaintiff engaged in some light-hearted banter with several police officers on duty that evening.

10.    At or around approximately 11:30 PM, approximately thirty (30) minutes after the curfew set by Defendant, upon information and belief there were approximately 300-400 protestors still present in downtown Raleigh.

11.    After realizing the organizers of the protest had already departed, Plaintiff and other protestors decided to leave the protest as well.

12.    As the Plaintiff and fellow protestors were leaving, members of the Raleigh Special Weapons and Tactics Unit (hereinafter, "SWAT") team arrived.

2

13.     At this point, Plaintiff was located around Nash Square, when the situation began to escalate.

14.     Plaintiff witnessed an unknown protester located to the right of Plaintiff throw a water bottle at the SWAT team from the opposite direction from where Plaintiff was positioned.

15.     The water bottle throw initiated a show of physical force initiated by the Raleigh SWAT team against a group of protestors located to the left of Plaintiff, despite that group being in the opposite direction from where the water bottle was thrown.

16.     After witnessing an observer being pushed and harassed by the SWAT team, Plaintiff began to record the incident with his phone camera.

17.     Plaintiff moved to the other side of the street after being ordered to by the SWAT team.

18.     As more SWAT team members arrived at the scene, one member of the SWAT team pointed a gun at the Plaintiff and stated "I remember you from an hour ago, do you want to go to jail?"

19.     After Plaintiff responded to the Raleigh police officer that he did not want to go to jail, the officer responded, "You need to get the fuck out of here."

20.     Then the Raleigh police officers began chasing the Plaintiff, while simultaneously firing flash bangs and, upon information and belief, pepper balls.

21.     Plaintiff ran throughout Downtown Raleigh and ran near a group of police officers who were already situated near Nash Square in Downtown Raleigh.

22.     Plaintiff began to run to avoid a group of approximately twenty (20) officers chasing him.

23.     As he turned right down an alleyway, Plaintiff was slightly struck by a side mirror of a Raleigh Police Department SUV.

24.     A police officer immediately ran to the Plaintiff and ordered Plaintiff to "stop and put his hands up."

25.     Plaintiff immediately put his hands up and walked at a slow pace.

26.     While Plaintiff attempted to comply with the instructions, a Raleigh police officer, who upon information and belief is named Officer Brown, rushed him, picked him up, tackled him, and slammed him so the back of his head hit first into the pavement.

27.     After Plaintiff was subdued by force, approximately five other police officers jumped on Plaintiff and placed their knees on his neck and arms.

28.     While pinned down on the ground, Plaintiff felt several officers striking him in his sides.

29.     Plaintiff was instructed to place his hands behind his back, but was unable to do so due to approximately five or more police officers restraining him.

30.     One officer next told Plaintiff that there was a white residue on the Plaintiff's person.

31.     The officers began a search of Plaintiff's bag, examining Plaintiff's work gloves and emptying Plaintiff's water bottle, and ended up tearing Plaintiff's bag to pieces.

32.     Plaintiff was then placed under arrest.

33.     When Plaintiff inquired about what he was being arrested for, the officers responded: "We're going to figure it out, but right now resisting arrest and assaulting a police officer."

4

34.     Plaintiff had a headache, was gushing blood, and was complaining of seeing double, so the officers transported Plaintiff to emergency medical assistance for medical attention, with handcuffs still on Plaintiff.

35.     After briefly examining the Plaintiff, an EMT asked Plaintiff if he needed to go to the hospital, to which the Plaintiff responded, "I don't know, what happens if I go to the hospital?"

36.     The officers immediately interjected by stating, "It doesn't matter, you're going to jail regardless."

37.     The officers proceeded to place Plaintiff in a police vehicle with a urine-soaked floor, along with two legal observers, to transport him to jail.

38.     During the police vehicle ride, Plaintiff began to feel concussion symptoms such as dizziness, nausea, and an unbalanced equilibrium and asked an officer to be tested for a concussion and for medical care.

39.     Someone not wearing a badge responded by briefly flashing a light in Plaintiff's eye and telling Plaintiff he was fine. No other medical care was administered.

40.     Prior to being transported to jail, the Plaintiff was told to sign, via an electronic iPad device, a medical treatment acceptance document to acknowledge and approve of the medical care he received from the EMT.

41.     The Plaintiff, while handcuffed, had an iPad held near his fingers, which the police officer moved around in order to simulate and fake Plaintiff's signature.

42.     Plaintiff continued to complain about feeling unwell, and was asked once again whether he needed to go to the hospital, but an officer slammed the van door before Plaintiff could respond.

43.     During the police vehicle ride, the Plaintiff and other passengers were told to buckle up, despite being unable to, due to being handcuffed.

44.     The officers played the song "We Are the Champions" repeatedly until the police vehicle reached the processing center.

45.     When Plaintiff arrived at the jail for processing, his arrest slip was placed in his bag. Upon information and belief,, the arrest slip in his bag indicated different charges than what Plaintiff was originally informed.

46.     At jail, the Plaintiff was initially denied medical care for his concussion symptoms, as was his request for a mask to prevent the spread of Covid-19.

47.     After a period of time, Plaintiff was given a mask and did receive some light medical care from a nurse.

48.     Plaintiff reported symptoms of dizziness, nausea, and unbalanced equilibrium to the nurse at jail.

49.     Plaintiff sat in the jail for at least three hours, during which time Plaintiff heard a jail staff member say they had a "white male here. We don't know why he's here."

50.     When Plaintiff inquired about the cause of his arrest at jail, he was given conflicting statements by the police about the arresting officer, time, and location of his arrest.

51.     For example, Plaintiff was given a second arrest report, which says Plaintiff was arrested in Moore Square (although Plaintiff was in fact detained by Nash Square), by a different officer, and at a different time than when he was arrested.

52.     Additionally, when an officer placed Plaintiff under arrest, they informed him that the reason was for finding a white residue on Plaintiff.

53.     Eventually, Plaintiff was informed that he was arrested for a curfew violation, in conflict with what Plaintiff was initially told.

54.     While Plaintiff was awaiting being processed at jail, the nurse and a police officer intentionally ignored his requests to go to the hospital.

55.     When the nurse saw who was asking for medical assistance, she said that she "was not dealing with him anymore."

56.     At one point, after repeated requests, the police officer laughed and walked away when Plaintiff asked to go to the hospital.

57.     After being processed, Plaintiff was released at approximately 5AM on August 29, 2020.

58.     Throughout the entire period Plaintiff was in custody, he was never read his Miranda rights.

59.     When Plaintiff woke up from sleeping the next morning, he was unable to move much of his body, he had intense light sensitivity, and he was seeing double.

60.     Plaintiff described waking up as similar to "feeling like he was in a bad car accident."

61.     A friend of Plaintiff transported him to urgent care for medical attention.

62.     Urgent care medical staff noted Plaintiff sustained a strained shoulder injury, a severe concussion, lacerations on his right knee and elbow, as well as contusions.

63.     A few weeks after visiting urgent care, Plaintiff sought medical attention in Chapel Hill for recurring severe headaches that started after being tackled by the officer.

64.     Since sustaining injuries on the evening of August 28, 2020, Plaintiff still suffers from severe headaches.

7

65.     In addition to suffering from severe headaches, Plaintiff has suffered an exacerbation of depression from the incidents of August 28, 2020 and currently attends therapy sessions to treat depression.

66.     Plaintiff has also attended physical therapy and a chiropractor to treat physical injuries sustained on August 28, 2020.

67.     Currently, Plaintiff still suffers from light sensitivity, short term memory loss, headaches, post concussion syndrome, and periods of an unbalanced equilibrium.

68.     In subsequent visits to UNC Health after the incidents of August 28, 2020, Plaintiff has been diagnosed with a concussion, a right elbow contusion, a right knee contusion, and presented with neck and back pain.

69.     In addition to treatment for physical ailments, Plaintiff has received treatment at UNC Health for depression, attention difficulties, short-term memory loss, and insomnia that has worsened since the incidents of August 28, 2020.

## **VI. CAUSE OF ACTION**

FIRST CAUSE OF ACTION

(Violation of 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution due to Defendant's Use of Excessive Force)

70.     Plaintiff hereby incorporates paragraphs 1-69 by reference.

71.     Defendant, by and through the Raleigh police officer(s) who tackled and struck Plaintiff, violated Plaintiff's constitutional rights by using excessive force in Defendant's arrest of the Plaintiff.

72.     Defendant acted under the color of state law by donning his Raleigh Police Officer uniform, announcing himself as a police officer, and wearing a badge.

8

73.     Defendant's arrest of Plaintiff was unlawful, as there was no probable cause that would lead a reasonable police officer in Defendant's position to believe that Plaintiff not following officers' directives to leave the scene, or acting in any other unlawful manner.

74.     Plaintiff was walking around peacefully, not causing any harm to anyone, and such actions, facts, and circumstances would not lead to any reasonable trustworthy information which would lead to a finding of probable cause.

75.     Defendant did not know the reason for arresting Plaintiff, as an officer indicated to Plaintiff that, "they would figure it out later."

76.     Defendant is well aware that in order to effectuate a reasonable arrest, the seizure must be at the very least supported by probable cause.

77.     "Figuring out" the crime after one has already been arrested is not how the law, nor the Constitution, dictates the procedure should go.

78.     Further, Defendant declined to read Plaintiff his *Miranda* rights, as required through well-established case law.

79.     The Defendant's use of force against Plaintiff was not reasonable under the circumstances, and was excessive.

80.     A reasonable officer at the time would not tell someone to go, then chase after them, slam them head-first into the concrete, kneel on their neck, and then decline them medical assistance.

81.     Defendant exacerbated the situation by throwing Plaintiff into the back of a police vehicle, where Plaintiff was forced to remain for a long time while continuously being denied medical care, despite specifically asking for it.

9

82.     Through Defendant's acts and omissions, including the battery on Plaintiff and the declination to provide or arrange medical care when its need was obvious to a reasonable person, Plaintiff was harmed.

83.     Defendant's actions of kicking Plaintiff and slamming Plaintiff on the concrete head-first and kneeling on his neck, depriving him of oxygen, resulted in several injuries, including lacerations on knees and elbows, a chin injury, a strained shoulder, and a severe concussion.

84.     Further, Defendant's actions and omissions still negatively affect Plaintiff to this day.

85.     Plaintiff suffers from repeated headaches and light sensitivity, and short term memory loss, and other health related injuries and traumas related to post concussion syndrome.

86.     Plaintiff has had to pay for physical therapy and a chiropractor, and has had to get neural exams as well as a result of Defendant's actions.

87.     Moreover, as a result of Defendant's actions and omissions, Plaintiff checked himself back into therapy in order to deal with depression which has been drastically exacerbated by the events, facts, and circumstances of the evening giving rise to this Complaint.

88.     As a direct and proximate result of the Defendant's actions, Plaintiff has suffered damages in excess of $25,000.00.

SECOND CAUSE OF ACTION

(Excessive Force - Common Law Battery)

89.     Plaintiff hereby incorporates paragraphs 1-69 by reference.

90.     Defendant, by and through the Raleigh police offer(s) who struck and tackled Plaintiff, intentionally made contact with Plaintiff and Plaintiff's person by tackling Plaintiff, slamming Plaintiff head first into concrete, and placing handcuffs on Plaintiff.

91.     Defendant further intentionally made contact with Plaintiff by placing Defendant's knee on Plaintiff's neck.

92.     Plaintiff at no point in the encounter gave any consent which would indicate that Defendant had Plaintiff's consent to treat Plaintiff in such a manner.

93.     Defendant's acts resulted in severe bleeding, a concussion, and long term effects including memory loss, headaches, and post concussion syndrome .

94.     Plaintiff was injured through Defendant's acts during an arrest.

95.     Defendant, through it's officer agent, interrupted Plaintiff's participation in a public gathering in order to peacefully protest injustices in the criminal system.

96.     Defendant was acting under the color of state law, as Defendant was wearing his uniform, was armed with police equipment, and was accompanied by other officers.

97.     Defendant significantly restricted Plaintiff's freedom, as Plaintiff was leaving the site, and Defendant chased and tackled Plaintiff.

98.     Defendant indicated that there was no probable cause to Plaintiff.

99.     Specifically, Plaintiff asked Defendant why he was being arrested, to which Defendant responded, "We'll figure that out later."

100.    Additionally, there was no evidence, circumstantial or otherwise, that would lead Defendant to believe that Plaintiff had committed or was committing an offense.

101.    The facts and circumstances surrounding this situation indicate that Defendant's actions were unreasonable.

102. Plaintiff, as stated, was not committing any offense, nor was there any indication that would lead an officer to believe that he was.

103. As such, it is hardly reasonable that Plaintiff's actions of walking around would lead a reasonable person to believe that the reasonable reaction to this would be to tackle Plaintiff, slam Plaintiff head-first into concrete, and place the Defendant's knee on Plaintiff's neck.

104. Additionally, it is even less reasonable that Defendant mocked Plaintiff on the drive to the jail and when Plaintiff repeatedly asked for medical assistance.

105. Through the acts of the Defendant, Plaintiff has had to foot the bill for various expenses including but not limited to various hospital bills.

106. Due to Defendant's act of slamming Plaintiff head-first into concrete, Plaintiff now suffers from serious memory issues, headaches, and post concussion syndrome, which has drastically affected his everyday life.

107. Plaintiff has been damaged in an amount in excess of $25,000.00.

## THIRD CAUSE OF ACTION

### (Excessive Force - Punitive Damages)

108. Plaintiff hereby incorporates paragraphs 1-109 by reference.

109. Defendant's actions and omissions were reckless and showed a callous indifference to the federally protected rights of the Plaintiff, namely the right to be free from excessive force and the harm it can cause as a result during an arrest.

110. Defendant's actions, omissions, and conduct was reprehensible and as a result, Plaintiff is entitled to punitive damages in an amount to be determined at trial.

## VII. JURY TRIAL DEMAND

111.    Pursuant to Rule 38(b) of the North Carolina Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury on all claims and issues so triable.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that a judgment be entered as follows:

1.    That Plaintiff be awarded monetary relief as hereinabove requested, including but not limited to:

      a.    Actual Damages;

      b.    Punitive Damages;

      c.    Reasonable attorneys' fees and costs of this case;

2.    That the Court awards such other relief as it deems just and proper.

This the ___13th__ day of December 2021.

Respectfully Submitted,

DELBERT QUILLEN WARD

On behalf of the Plaintiff:

by

JONATHAN CARNES
Attorney at Law

Jonathan A. Carnes, Managing Partner
N.C. State Bar No. 49656
CarnesWarwick
555 Fayetteville Street, Suite 300
Raleigh, NC 27601
Tel:    919-441-3218
Fax:    (339) 613-3009
jonathan@carneswarwick.law
Attorney for Plaintiff

TARA WARWICK
Attorney at Law

Tara Warwick, Managing Partner
N.C. State Bar No. 48779
CarnesWarwick
555 Fayetteville Street, Suite 300
Raleigh, NC 27601
Tel:    (919) 714-9135
Fax:    (339) 613-3009
tara@carneswarwick.law
Attorney for Plaintiff